**Jerome A. ADKINS et al., Plaintiffs,**

v.

**The SCHOOL BOARD OF THE CITY OF NEWPORT NEWS, et al., Defendants.**

**Leola Pearl BECKETT et al., Plaintiffs,**

v.

**The SCHOOL BOARD OF THE CITY OF NORFOLK, VIRGINIA, et al., Defendants.**

**Civ. A. Nos. 489, 2214.**

United States District Court
E. D. Virginia
Newport News Division (No. 489)
Norfolk Division (No. 2214).

Jan. 11, 1957.

No. 489:

W. Hale Thompson, Philip S. Walker, Newport News, Va., Spottswood W. Robinson, III and Oliver W. Hill, Richmond, Va., Victor J. Ashe, Norfolk, Va., for Jerome A. Adkins and others.

Harry L. Nachman, City Atty., Newport News, Va., J. Lindsay Almond, Jr., Atty. Gen. of Virginia, Henry T. Wickham, Sp. Asst. to Atty. Gen., T. Justin Moore, Archibald G. Robertson, John W. Riely and T. Justin Moore, Jr., Richmond, Va., for School Board of City of Newport News, Va.

No. 2214:

Victor J. Ashe and J. Hugo Madison, Norfolk, Va., Spottswood W. Robinson, III and Oliver W. Hill, Richmond, Va., for Leola Pearl Beckett and others.

Leigh D. Williams, Leonard H. Davis, City Atty. for City of Norfolk and W. R. C. Cocke, Norfolk, Va., J. Lindsay Almond, Jr., Atty. Gen. of Virginia, Henry T. Wickham, Sp. Asst. to the Atty. Gen., for School Board of City of Norfolk, Va.

HOFFMAN, District Judge.

In identical class actions certain Negro children and their parents, or others who stand in loco parentis, have instituted these suits seeking the guidance and assistance of this Court to require the defendants [1] to cease and desist from the policy, practice, custom and usage of denying the infant plaintiffs, solely by reason of their race or color, admission to and education in any public school operated solely for children of the white race; and requiring the infant plaintiffs, solely because of their race or color, to attend public schools operated exclusively for Negro children.

In identical answers [2] defendants originally filed motions to dismiss the actions on the following grounds:

(a) The School Boards allege that they are agencies of the State of Virginia and the State has not given its consent to be sued;

(b) The Division Superintendents allege that the respective complaints fail to state a claim against them upon which relief can be granted; and

(c) The Court lacks jurisdiction and the proceedings involve no case or controversy upon which relief should be granted.

At a pre-trial conference in the Newport News case held on the 2nd day of July, 1956, the Court took cognizance of the fact that the Governor of Virginia had declared his intention to convene the General Assembly of Virginia in Special Session not later than September 6, 1956, to enact certain legislation dealing with the problems involving public education following the decisions of the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, as well as other related School Segregation Cases. An order was entered [3] permitting counsel for all parties to file such additional pleadings and such amendments of pleadings as counsel desired; the filing date to be within 20 days after the enactment of any public school legislation by the General Assembly of Virginia, regardless of the effective date of such law.

Within the time specified by the Court's order, defendants filed supplemental motions to dismiss which are identical in each case. The basis of the supplemental motions is that the plaintiffs have not exhausted the administrative remedies allegedly afforded them by Chapter 70 of the Acts of Assembly for the Extra Session of 1956. On November 17, 1956, the Court heard extensive arguments [4] in both cases on the motions to dismiss. In short, plaintiffs concede that they have not attempted to exhaust the alleged administrative remedies provided under the aforementioned

---

[1] In addition to the local School Boards, the respective Division Superintendents of Schools are named as parties defendant in each case.

[2] It is unnecessary to set forth the averments, admissions or denials of the answers as the matter is now before the Court on defendants' motions to dismiss.

[3] A similar order was thereafter entered in the Norfolk case.

[4] Argument of counsel consumed nearly 5 hours and has been transcribed.

Chapter 70; nor do they intend to do so as it is their contention that Chapter 70 is unconstitutional *on its face* as contrasted with being unconstitutional in its application. While the Act which is the subject matter of this controversy did not become effective until December 28, 1956, counsel agreed that the argument on November 17, 1956, would be treated as though the Act was effective, and the Court would defer its decision until subsequent to the effective date of the new law.

As to the issues raised in the original motions to dismiss, these matters are concluded by the opinion of the United States Court of Appeals for the Fourth Circuit in the Charlottesville and Arlington school cases[5] on appeals from District Judges Paul and Bryan respectively. Nothing need be added thereto as counsel concede that this opinion is binding upon this Court.

The two remaining questions for this Court's determination are:

(1) Are the new school laws of Virginia, and particularly the aforementioned Chapter 70, unconstitutional on their face?

(2) Is a three-judge court required by law to decide the constitutional question raised by the defendants' supplemental motions to dismiss?

*The Constitutionality of the Public Placement Act as Provided by Chapter 70, Acts of Assembly, Extra Session of 1956.*

■ It is a well-settled principle of law that legislation enacted carries with it a presumption of constitutionality. There are, however, certain limitations on the application of this rule as stated in *Ex parte Endo*, 323 U.S. 283, 299, 65 S.Ct. 208, 217, 89 L.Ed. 243, where it is said that the Supreme Court "has quite consistently given a narrower scope for the operation of the presumption of constitutionality when legislation appeared on its face to violate a specific provision of the Constitution". And in Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194, appears this language:

"All legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny."

■ Counsel for the respective School Boards concede that this Court is obliged to follow the rulings of the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit. It does not lie within the purview of a District Judge to alter or amend these decisions irrespective of the wisdom of the same—that remedy rests in the highest court of the nation or in a constitutional amendment.

■ Equally well-settled is the principle that, in determining the constitutionality of legislation, a court should examine the legislative history of same to ascertain the legislative purpose and intent, and that acts in *pari materia* should be construed together.[6] Statutes having the same general purpose, relating to the same class of subjects, constituting parts of the same general plan, and aimed at the accomplishment of the same results, are all considered together[7]. It is significant that the Supreme Court of Appeals of Virginia has consistently adhered to this doctrine and it is largely immaterial in

5. School Board of City of Charlottesville v. Allen (County School Board of Arlington County, Virginia v. Thompson), 240 F.2d 59.

6. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40; Sanford's Estate v. Commissioner of Internal Revenue, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; Joy v. Green, 194 Va. 1003, 76 S.E.

2d 178; Soble v. Herman, 175 Va. 480, 9 S.E.2d 459.

7. Seaboard Finance Corp. v. Commonwealth, 185 Va. 280, 38 S.E.2d 770; Commonwealth v. Sanderson, 170 Va. 33, 195 S.E. 516; Soble v. Herman, supra; Employers Reinsurance Corp. v. Bryant, 299 U.S. 374, 57 S.Ct. 273, 81 L.Ed. 289.

determining whether the legislation was passed at the same session, or at an earlier date without reference to the statute in *pari materia* [8]. Similarly, reports of legislative committees and pertinent resolutions, while not binding upon the Court, may be examined to ascertain the legislative intent in enacting the laws under attack [9].

With these uncontroverted principles in mind the Court is duty bound to review the forerunners and objectives leading to the enactment of Chapter 70 (referred to as the Pupil Placement Act) by the Special Session of the General Assembly of Virginia in September, 1956.

Following the first decision of the United States Supreme Court in Brown v. Board of Education, supra, decided May 17, 1954, the Governor of Virginia, on August 30, 1954, created and appointed a legislative commission, known as the Virginia Commission on Public Education, consisting of 32 members of the General Assembly, with instructions to make appropriate recommendations. After a period of slightly more than 14 months, it submitted its report to the Governor in what is generally referred to as the "Gray Report", named for the Chairman of the Commission. In substance, the Commission expressed its views that separate facilities in public schools were for the best interest of both races and recommended the enactment of a pupil assignment program permitting local school boards to assign pupils in such manner as would best serve the welfare of their communities and protect and foster the public schools in the localities in question. It further recommended that no child be required to attend a school wherein both white and colored children are taught, and suggested tuition grants for parents of children who objected to integrated schools, or who lived in communities wherein no public schools are operated. In further discussing its proposal the "Gray Commission" said:

"Such legislation would be designed to give localities broad discretion in the assignment of pupils in the public schools.

"Assignments would be based upon the welfare of the particular child as well as the welfare and best interests of all other pupils attending a particular school. The school board should be authorized to take into consideration such factors as availability of facilities, health, aptitude of the child and the availability of transportation.

"Children who have heretofore attended a particular public school would not be reassigned to a different one except for good cause shown. A child who has not previously attended a public school or whose residence has changed, would be assigned as aforesaid."

As the "Gray Report" was submitted to the Governor on November 11, 1955, the General Assembly of Virginia concluded that insufficient time remained to consider the "Gray Report" in detail at the 1956 Regular Session convening early in January. Certain resolutions were, however, presented and adopted, including Senate Joint Resolution No. 3, Acts 1956, p. 1213, generally referred to as the "Interposition Resolution". Without quoting verbatim the resolution under consideration it is sufficient to state that is urges the adoption of a constitutional amendment "to settle the issue of contested power" between State and Federal Governments. The preamble to the resolution and the final paragraph thereof are, to a limited extent, significant, where it is said in the preamble:

" * * * Recognizing, as this Assembly does, the prospect of in-

8. Mitchell v. Witt, 98 Va. 459, 36 S.E. 528.

9. Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; McFeely v. Commissioner of Internal Revenue, 296 U.S. 102, 56 S.Ct. 54, 80 L.Ed. 83; Boyer-Campbell Co. v. Fry, 271 Mich. 282, 260 N.W. 165, 98 A.L.R. 827.

calculable harm to the public schools of this State and the disruption of the education of her children, Virginia is in duty bound to interpose against these most serious consequences, and earnestly to challenge the usurped authority that would inflict them upon her citizens."

And in the final paragraph:

"And be it finally resolved, that until the question here asserted by the State of Virginia be settled by clear Constitutional amendment, we pledge our firm intention to take all appropriate measures honorably, legally and constitutionally available to us, to resist this illegal encroachment upon our sovereign powers, and to urge upon our sister States, whose authority over their own most cherised powers may next be imperiled, their prompt and deliberate efforts to check this and further encroachment by the Supreme Court, through judicial legislation, upon the reserved powers of the States."

It was of course, within the prerogative of the General Assembly to adopt this and any other resolution [10] but the distinguished members of this body (many of whom are able attorneys) must recognize that such proclamations may have some bearing upon the questions of intent in arriving at a determination of the constitutionality of any laws subsequently enacted. The passage of the resolutions to which reference has been made is not, however, determinative of the final issues in these cases now pending.

On August 27, 1956, the Governor of Virginia addressed the General Assembly at its Special Session convened for the purpose of considering educational matters. Included in his remarks are the following comments:

"The people of Virginia and their elected representatives, are confronted with the gravest problems since 1865. Beginning with the decision of the Supreme Court of the United States on May 17, 1954 [Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873], there has been a series of events striking at the very fundamentals of constitutional government and creating situations of the utmost concern to all of our people in this Commonwealth, and throughout the South.

"Because of the events I have just mentioned, I come before you today for the purpose of submitting recommendations to continue our system of segregated public schools.

\* \* \* \* \* \* \* \* \*

"We have an excellent system of public schools in Virginia, for both white and Negro pupils. We have invested many millions of dollars in it and have vastly increased appropriations, both state and local, for its maintenance and operation. We have done this because we realize the importance of education to all our citizens. We want to preserve this system and the opportunities it offers, without discrimination to members of all races. We are convinced that it can be preserved and operated as an efficient state-wide system only by segregation of the races. We likewise are satisfied that we are within our rights, historically and legally, in taking every honorable and constitutional step to retain control and jurisdiction over this cherished system of public education. Our position was confirmed and encouraged by every decision of the Supreme Court of the United States over a period of nearly sixty years, prior to 1954.

10. The 1956 Regular Session likewise adopted House Joint Resolution No. 97, referred to as the "Pope Resolution", declaring the public policy of Virginia to be opposed to athletic teams of any public free school engaging in contests within the State of Virginia with other teams on which persons of the white and colored races are members.

" * * * Manifestly, integration of the races would make impossible the operation of an efficient system. By this proposed legislation, the General Assembly, properly exercising its authority under the Constitution, will clearly define what constitutes an efficient system for which State appropriations are made.

"The proposed legislation recognizes the fact that this is the time for a decisive and clear answer to these questions:

"(1) Do we accept the attempt of the Supreme Court of the United States, without constitutional or any other legal basis, to usurp the rights of the States and dictate the administration of our internal affairs? (2) Do we accept integration? (3) Do we want to permit the destruction of our schools by permitting 'a little integration' and witness its subsequent sure and certain insidious spread throughout the Commonwealth? My answer is a positive 'No'. On the other hand, shall we take all appropriate measures honorably, legally and constitutionally available to us, to resist this illegal encroachment upon our sovereign powers? My answer is a definite 'Yes', and I believe it to be the answer of the vast majority of the white people of Virginia as well as the answer of a large, if unknown, number of Negro citizens."

Manifestly, the Governor of Virginia has suggested that there shall be "no integration" of races in the public schools of Virginia, irrespective of how slight it may be. The question remains: Has Virginia now enacted a constitutional act which is non-discriminatory in nature, and hence not in violation of the Fourteenth Amendment to the Constitution of the United States as interpreted by the United States Supreme Court in the School Segregation Cases which counsel for the defendants, including the able Attorney General of Virginia, admit are binding upon this Court? In compliance with my oath of office and my duty to determine matters from a legalistic viewpoint in accordance with the decisions of the appellate courts, I must answer this question in the negative as it is my firm conviction that Chapter 70, known as the Pupil Placement Plan, is unconstitutional on its face. The legislation is directly in the teeth of the language of the Supreme Court in Brown, supra, where it is declared "the fundamental principle that racial discrimination in public education is unconstitutional", and "all provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle".

Certainly in the Fourth Circuit it is now the law that plaintiffs in this type of action must exhaust their administrative remedies before seeking relief in the federal courts. Carson v. Board of Education, 4 Cir., 227 F.2d 789; Hood v. Board of Trustees, 4 Cir., 232 F.2d 626; Carson v. Warlick, 4 Cir. 238 F.2d 724; Robinson v. Board of Education, D.C.Md., 143 F.Supp. 481; School Board of City of Charlottesville v. Allen, 4 Cir., 240 F.2d 59. But Carson v. Warlick, supra, and the Charlottesville and Arlington school cases point out that the *administrative remedy must be adequate*, and Carson refers to Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, where it is suggested that certain so-called administrative remedies nullify "sophisticated as well as simple-minded modes of discrimination". Is the alleged administrative remedy adequate on its face or is it, as the Court concludes, in truth and in fact an "administrative block"? Let us now review the proceedings of the 1956 Extra Session to ascertain whether any adequate administrative remedy appears therein.

The General Assembly amended and reenacted the Appropriations Act, previously approved March 31, 1956, acts 1956, c. 716, to provide that the sums appropriated in Items 133, 134, 137, 138 and 143 would be solely for the maintenance of an *efficient* system of elementary

and secondary schools, and prohibiting the expenditure of any of the funds appropriated by such items in support of any system of public schools which is is not *efficient* [11]. It will be noted by reference to the items involved that the key word is "efficient". Following the amendment to Item 143 will be found a statement of policy which clearly establishes the intent of the General Assembly of Virginia in these words:

"The General Assembly declares, finds and establishes as a fact that the mixing of white and colored children in any elementary or secondary public school within any county, city or town of the Commonwealth constitutes a clear and present danger affecting and endangering the health and welfare of the children and citizens residing in such county, city or town and that no efficient system of elementary and secondary public schools can be maintained in any county, city or town in which white and colored children are taught in any such school located therein.

"An efficient system of elementary public schools means and shall be only that system within each county, city or town in which no elementary school consists of a student body in which white and colored children are taught.

"An efficient system of secondary public schools means and shall be only that system within each county, city or town in which no secondary school consists of a student body in which white and colored children are taught.

"The General Assembly, for the purpose of protecting the health and welfare of the people and in order to preserve and maintain an efficient system of public elementary and secondary schools, hereby declares and establishes it to be the policy of this Commonwealth that no public elementary or secondary schools in which white and colored children are mixed and taught shall be entitled to or shall receive any funds from the State Treasury for their operation, and, to that end, forbids and prohibits the expenditure of any part of the funds appropriated by Items 133, 134, 137, 138 and 143 of this section for the establishment and maintenance of any system of public elementary or secondary schools, which is not efficient.

"The appropriations made by Items 133, 134, 137, 138 and 143 of this section shall be deemed to be appropriated separately to the counties and cities and the funds made available and apportioned to the counties and cities severally and separately by the Department of Education and the State Board of Education shall be separately subject to the limitations imposed in this section for their use, which limitations and a strict observance thereof shall be a condition precedent to their use.

---

11. Italicized words reveal the amendment.

(a) Item 133 appropriates $698,000 for each year of the Biennium "for the establishment and maintenance of local supervision of instruction in *efficient* elementary and *secondary* schools, including visiting teachers, to be apportioned among such schools by the State Board of Education".

(b) Item 134 appropriates $34,342,000 and $37,882,000 for the respective years of the Biennium "for basic appropriation for *salaries of teachers employed only in efficient elementary and secondary schools*."

(c) Item 137 appropriates $7,079,680 and $9,174,625 for the respective years of the Biennium "for salary equalization *of teachers employed only in efficient elementary and secondary schools*".

(d) Item 138 appropriates $3,240,090 and $6,536,400 for the respective years of the Biennium "for providing a minimum educational program in *efficient elementary and secondary schools only*".

(e) Item 143 appropriates $4,895,145 and $5,035,145 for the respective years of the Biennium "for pupil transportation *to and from efficient elementary and secondary schools only*".

"For the purposes of this section and all other applicable laws, the public schools of the counties, cities and towns shall consist of two separate classes, namely, elementary and secondary schools.

"Notwithstanding any other provisions of this Chapter or the provisions of any other law, whenever the student body in any elementary or secondary public school shall consist of both white and colored children, the Department of Education, the State Board of Education, the State Comptroller, the State Treasurer, local school board, local treasurer, and any officer of the State or of any county or city who has power to distribute or expend any of the funds appropriated by Items 133, 134, 137, 138 and 143, each severally and collectively, are directed and commanded to refrain immediately from paying, allocating, transferring or in any manner making available to any county, city or town in which such school is located any part of the funds appropriated in Items 133, 134, 137, 138 and 143 for the maintenance of any public school of the class of the school in which white and colored children are taught. Whenever it is made to appear to the Governor, and he so certifies to the Department of Education, that all such schools of such class within any such county, city or town can be maintained and operated without white and colored children being mixed or taught therein, the funds appropriated in Items 133, 134, 137, 138 and 143 to such county or city shall be made available, subject to the limitations contained herein and only for such period of time as it is made to appear to the Governor that there is no school of that class being operated in such county, city or town, in which white and colored children are mixed and taught, provided that all the limitations herein contained shall again be effective im-mediately whenever it appears that any children are being mixed and taught in any public school of the class involved.

"It is provided that the limitations herein set forth shall not prohibit the release and distribution of the funds apportioned and allocated, or any unexpended part thereof, to which any county, city or town would otherwise be entitled, to such county, city or town for the payment of salaries and wages of unemployed teachers in State aid teaching positions, and other public school employees, who are under contract and for educational purposes which may be expended in furtherance of elementary and secondary education of Virginia students in nonsectarian private schools, as may be provided by law."

Thus it follows, as a matter of law, that whenever the student body of any elementary or secondary school shall consist of both white and colored children, whether placed there by the Pupil Placement Board or pursuant to a court order, the funds appropriated under the five numbered items shall terminate as to *all* schools of the same class in that particular county, city or town. For the first year of the Biennium the aggregate of the funds provided in the five items is $53,254,915 out of a total budget of $60,560,210; for the second year the aggregate is $59,326,170 out of a total budget of $67,076,205. It is argued that the county, city or town so affected would still have available approximately $7,500,000 for each year of the Biennium, but counsel have overlooked the fact that the other items must be pro-rated between all counties, cities and towns throughout the State. Additionally, there are many of the remaining items payable for state administration or otherwise apportioned under rules and regulations of the State Board of Education with the approval of the Governor. Only such items as vocational education and industrial rehabilitation will not materially suffer. While it is

true that there are other funds apportioned and returned to the localities, this would be a mere pittance to what is required to operate the public schools of any community. It follows that the General Assembly has substantially cut off all funds for school appropriation at the state level for any class of schools in the entire locality, in the event any white and colored children are permitted to attend the same school.

With this background the General Assembly proceeded to enact the Pupil Placement Act [12], the constitutionality

12. The pertinent provisions of Chapter 70, Pupil Placement Act, are as follows:

"§ 1. All power of enrollment or placement of pupils in and determination of *school attendance districts for the pub-lic schools in Virginia is hereby vested in a Pupil Placement Board as herein-after provided for.* The local school boards and division superintendents are hereby divested of all authority now or at any future time to determine the school to which any child shall be admitted. The Pupil Placement Board is hereby empowered to adopt rules and regulations for such enrollment of pupils as are not inconsistent with the provisions hereinafter set forth. Such rules and regulations shall not be subject to Chapter 1.1 of Title 9 of the Code of Virginia the short title of which is "General Administrative Agencies Act". The Pupil Placement Board and any of its agents hereinafter provided for shall have authority to administer oaths to those who appear before said Board or any of its agents in connection with the administration of this act.

"§ 2. *The Pupil Placement Board may* designate, appoint and employ such agents as it may deem desirable and necessary in the administration of this act. It may authorize such agents to hold the hearings hereinafter provided for and take testimony and submit recommendations in any and all cases referred to them by said Board.

"§ 2a. For *the conduct of such hear-ings and to facilitate the performance of the duties imposed upon it and its agents* under this act, the Pupil Placement Board is authorized to promulgate all such rules and regulations and procedures and prescribe such uniform forms as it deems appropriate and needful and to require strict compliance with the same by all persons concerned.

"§ 3. The Pupil Placement Board in enrolling each pupil in a school in each school district shall take into consideration:

"(1) The effect of the enrollment on the welfare and best interests of such child and all other children in said school as well as the effect on the efficiency of the operation of said school.

"(2) The health of the child as compared to other children in the school.

"(3) The effect of any disparity between the physical and mental ages of any child to be enrolled especially when contrasted with the average physical and mental ages of the group with which the child might be placed.

"(4) Availability of facilities.

"(5) The aptitude of the child.

"(6) Availability of transportation.

"(7) The sociological, psychological, and like intangible social scientific factors as will prevent, as nearly as possible, a condition of socioeconomic class consciousness among the pupils.

"(8) Such other relevant matters as may be pertinent to the efficient operation of the schools or indicate a clear and present danger to the public peace and tranquility affecting the safety or welfare of the citizens of such school district.

"§ 4. After the effective date of this act, each school child who has heretofore attended a public school and who has not moved from the county, city or town in which he resided while attending such school shall attend the same school which he last attended until graduation therefrom unless enrolled, for good cause shown, in a different school by the Pupil Placement Board.

"§ 5. Any child who desires to enter a public school for the first time following the effective date of this act, and any child who is graduated from one school to another within a school division or who transfers to a school division, or any child who desires to enter a public school after the opening of the session, shall apply to the Pupil Placement Board for enrollment in such form as it may prescribe, and shall be enrolled in such school as the Board deems proper under the provisions of this act. Such application shall be made on behalf of the child by his parent, guardian or other person having custody of the child.

"§ 6. Both parents, if living, or the parent or guardian of a pupil in any school in which a child is enrolled by action of the Pupil Placement Board, if aggrieved by an action of the Board, may file with the Board a protest in writ-

of which is the subject of this memorandum. The practical operation of this Act is unique, to say the least. At the outset it is necessary to consider the

ing within fifteen days after the placement of such pupil. Upon receipt of such protest the Board shall hold or cause to be held a hearing, within not more than thirty days, to consider the protest and at the hearing shall receive the testimony of witnesses and exhibits filed by such parents, guardians or other persons, and shall hear such other testimony and consider such other exhibits as the Board shall deem proper. The Board shall consider and decide each individual case separately on its merits. The Board shall publish a notice once a week for two successive weeks in a newspaper of general circulation in the city or county wherein the aggrieved party or parties reside. The notice shall contain the name of the applicant and the pertinent facts concerning his application including the school he seeks to enter and the time and place of the hearing. The Board shall, within not more than thirty days after the hearing, file in writing its decision, enrolling such pupil in the school originally designated or in such other school as it shall deem proper. The written decision of the Board shall set forth the findings upon which the decision is based. Any parent, guardian or other person having custody of any child in the particular school in which a child is enrolled by action of the Board shall be deemed an interested party and shall have the right to intervene in such proceeding in furtherance of his interest.

"§ 6a. Any parties aggrieved by a decision of the Pupil Placement Board under this act, or any party defined as an interested party in § 6 may obtain a review of such decision by filing an application in writing for a review thereof with the Governor within fifteen days after such decision. Such application shall be by a petition in writing, specifying the decision sought to be reviewed, and the actions taken by the Pupil Placement Board, together with a statement of the grounds on which the petitioner is aggrieved or by reason of which he is an interested party. The petitioner shall file with his petition a copy of the decision of the Pupil Placement Board and a transcript of the proceedings before the Pupil Placement Board, which shall be furnished to the petitioner by the Pupil Placement Board within ten days after request therefor upon payments of the costs of such transcript by the petitioner. Upon the filing of a petition for a review with the Governor, the Gov-

ernor shall set the same for a hearing and within fifteen days after the petition has been filed with him, he shall file, in writing, his decision, enrolling such pupil in the school originally designated or in such other school as he shall deem proper. The written decisions of the Governor shall set forth the findings upon which his decision is based.

"§ 7. Any party aggrieved by a decision of the Governor under this act or any party defined as an interested party in § 6 may obtain a review of such decision by filing in the clerk's office of the circuit court of the county or corporation court of the city in the jurisdiction of which such party resides, within fifteen days after such decision, a petition in writing, specifying the decision sought to be reviewed, and the actions taken by the Governor, together with a statement of the grounds on which the petitioner is aggrieved or by reason of which he is an interested party. The petitioner shall file with his petition a copy of the decision of the Governor and a transcript of the proceedings before the Governor, which shall be furnished to the petitioner by the Governor within ten days after request therefor upon payment of the costs of such transcript by the petitioner.

"§ 7a. Any interested party, as defined in § 6 may, by petition, intervene for the purpose of making known and supporting his interest, in any proceeding for review of the Pupil Placement Board's decision instituted by an aggrieved party or by another interested party; and the court having jurisdiction of such review proceedings shall hear the evidence of as many interested parties, as defined in § 6, in any such review proceeding, as in its discretion it may deem proper, whether or not such interested parties shall have petitioned for such review or petitioned to intervene therein.

"§ 8. Upon the filing of the petition the clerk of the court shall forthwith notify the Pupil Placement Board, requiring it to answer the statements contained in the application within twenty-one days, but failure to do so shall not be taken as an admission of the truth of the facts and allegations set forth therein. The clerk of the court shall publish a notice of the filing of such application once a week for two successive weeks in a newspaper of general circulation in the county or city for which the court sits and shall, in addition, post the same

language of § 4 which has the effect of "freezing" any child in the school now attended until graduation therefrom "unless enrolled, *for good cause shown,* in a different school by the Pupil Placement Board" consisting of three members appointed by the Governor[13]. The Attorney General, at the time of oral argument, stated that if any child could establish to the satisfaction of the Board that he was being deprived of attending any school by reason of race or color, this would be "good cause" in and of itself. Whether this interpretation of § 4 would be binding upon the Pupil Placement Board, or any successor Attorney General, is problematical. Plaintiffs answer this argument by stating that, after considering the provisions of § 3 as well as the legislative declarations in the Appropriation Act, the statement of the Attorney General may well be doubted and, in any event, such considerations are calculated to substantially impair the free exercise of any discretion the Board may have in the matter.

As to children attending school for the first time, or children transferring to another school division, or graduating from one class of school to another, such child is required to apply to the Pupil Placement Board and is thereafter enrolled "in such school as the Board deems proper under the provisions of this Act."

It is abundantly clear that the Board, in acting upon the application, must apply the standards prescribed under § 3 of Chapter 70. That section requires the Board to consider certain factors, among them being:

(1) The effect of the enrollment on the welfare and best interests of such child and all other children in said school as well as the effect on the *efficiency* of the operation of said school;

(2) The health of the child as compared to other children in the school;

(6) Availability of transportation;

(7) The sociological, psychological, and like intangible social scientific factors as will prevent, as nearly as possible, a condition of socioeconomic class consciousness among the pupils;

(8) Such other relevant matters as may be pertinent to the *efficient* operation of the schools or indicate a clear and present danger to the public peace and

---

at the door of the courthouse. The notice shall contain the name of the applicant and the pertinent facts concerning his application including the school he seeks to enter, and shall set forth the time and place for the hearing. The proceedings shall be matured for hearing upon expiration of twenty-one days from the issuance of the notice to the Pupil Placement Board by the clerk of the court and heard and determined by the judge of such court, either in term or vacation.

"§ 9. The findings of fact of the Pupil Placement Board shall be considered final, if supported by substantial evidence on the record.

"§ 10. From the final order of the court an appeal may be taken by the aggrieved party or any interested party, as defined in § 6, to the Supreme Court of Appeals as an appeal of right, in the same manner as appeals of right are taken from the State Corporation Commission.

"§ 10a. An injunction proceeding may be brought in any State court of compe-

tent jurisdiction by the Commonwealth, or by any interested party as defined in § 6, for the purpose of restraining the performance of any act, or any intended or threatened act, which may be in evasion of, in disregard of, or at variance with, any of the foregoing provisions.

"§ 11. Neither the Pupil Placement Board nor its agents shall be answerable to a charge of libel, slander or insulting words, whether criminal or civil, by reason of any finding or statement contained in the written findings of fact or decisions or by reason of any written or oral statement made during the proceedings or deliberations."

13. The three members of the Pupil Placement Board have, since the date of argument, been appointed by the Governor. They are residents of Danville, Nansemond County and Richmond. There is a serious question as to their authority to delegate their duties in considering routine applications for enrollment or transfer despite the provisions of § 2 and § 2a.

tranquility affecting the safety or welfare of the citizens of such school district.

The Pupil Placement Act was approved on September 29, 1956, which is the same date on which the Appropriations Act, Chapter 71, was amended and reenacted wherein the General Assembly made its declaration of policy and defined an "efficient" system of public schools. Under such a declared policy and definition the Pupil Placement Board would indeed be derelict in its duty if it ever permitted admission of a Negro child in a school heretofore reserved for white children, and vice versa. Courts cannot be blind to the obvious, and the mere fact that Chapter 70 makes no mention of white or colored school children is immaterial when we consider the clear intent of the legislative body.

■ The Attorney General argues that the Legislature has provided "a plain and simple path for any parent aggrieved, white or colored, to take it (the application) up." With this statement the Court must respectfully disagree. By § 129 of the Constitution of Virginia, the General Assembly is required to establish and maintain an efficient system of public schools throughout the State. That this provision is mandatory cannot be doubted under the decision of School Board of Carroll County v. Shockley, 160 Va. 405, 168 S.E. 419 [14]. The word "efficient" has not heretofore been defined by the Legislature or by the courts of Virginia. Suddenly, for the first time since the adoption of the Constitution of Virginia and significantly enough at a session of the General As-

sembly convened for the purpose of considering educational matters, the Legislature defines the word "efficient" in the Appropriations Act, and in Chapter 67, so as to exclude any school system wherein both white and colored children are in attendance. When we turn to the Pupil Placement Act and the use of the word "efficient" under § 3(1) and § 3(8), it would indeed be charitable to assume that the General Assembly had in mind varying interpretations of this word.

Assuming arguendo that a child is not barred under the provisions of § 4, and that the word "efficient" as used in § 3 (8) has no reference to the definition placed thereon by the terms of the Appropriations Act, the cumbersome procedure approved by the Legislature falls far short of meeting the test of an *adequate* administrative remedy. The procedure for a child already in school, who desires to attend another school, is not specified. Presumedly the child would make application for a change under § 5 through his parent, guardian, or other person having custody of the child. After the child has been placed in a particular school by the Pupil Placement Board, both parents, if living, or the parent or guardian of such child, may file a written protest with the Board, within 15 days after the date of placement. The Board then conducts a hearing within 30 days of the receipt of the written protest, after first giving notice of the hearing by newspaper publication once a week for two successive weeks. § 6 makes the parent, guardian, etc., of any child in the particular school in which a child is enrolled by action of the Board, an interested party with the right of interven-

14. While not here necessary to decide, the Shockley case, supra, casts doubt upon the constitutionality of § 10 of Chapter 68 (hereinafter discussed), as § 136 of the Constitution of Virginia limits the right of each county, city or town to levy taxes on property "not to exceed in the aggregate in any one year a rate of levy to be fixed by law". The problem facing any county, city or town is indeed difficult despite the provisions of Chapter 57, adopted September 29, 1956.

Furthermore, in the Shockley case, the Court said [160 Va. 405, 168 S.E. 421]: "Under the law the school board not only has the authority, but it is its duty, to protect the school revenues by proper legal action, whenever threatened with loss or detriment from any cause." The cut-off provisions of Chapter 71 certainly constitute a threatened loss to the localities considering the status of the taxpayers in that political subdivision.

tion. Thus, if child "A" desires to attend school "B", having a student body of 2,000 pupils, there could be 4,000 intervenors in that particular case, each of whom apparently has a legal right to be heard. Thirty days after the hearing (which must be interpreted to mean the termination thereof), the Board files its decision in writing, "enrolling such pupil in the school originally designated or in such other school as it shall deem proper", and the Board is further required to set forth the findings upon which the decision is based. Presumedly these findings would be predicated upon the factors specified in § 3.

Any party aggrieved by the decision of the Pupil Placement Board, including any intervenor parent, etc., may file a written application for a review by the Governor. Such application for review must be filed within 15 days after the Board's decision. Accompanying the petition for review is required a transcript of the proceedings before the Board, same to be provided within 10 days after request and upon payment of costs of such transcript by the petitioner[15]. The Governor is required to hear the review and file his decision in writing within 15 days after the petition is filed with him.

Any party, including the parents of children in the schools affected, may, if aggrieved by the action of the Governor, file a petition in an appropriate state court within 15 days of the Governor's decision[16]. The case is thereafter matured at the expiration of 21 days after issuance of notice by the Clerk to the Pupil Placement Board. An appeal of right to the Supreme Court of Appeals of Virginia is provided. It is hardly necessary to discuss any possible court proceedings as the so-called administrative remedy terminates with the decision of the Governor and any person who asserted the violation of the constitutional rights afforded by the Fourteenth Amendment could then seek relief in the federal courts. Carson v. Warlick, supra. It is, however, important to consider the time consumed by court review as to parents of children (other than the original petitioner) for the reason that no constitutional rights would there be involved. It is also noted that, under the provisions of § 9, the findings of fact of the Pupil Placement Board are considered *final*, if supported by substantial evidence on the record.

It thus appears that the so-called administrative remedy will consume 105 days until final decision by the Governor. A child seeking relief from the original designation of enrollment at the commencement of a school term in September could not, with any degree of confidence, anticipate a decision through administrative channels until the middle of December. His court action thereafter filed, either in the state or federal court, would not mature until the completion of his grade upon which he is then in attendance. This presents the serious question as to whether this child will not then be required to proceed anew as he will presumedly have been advanced to a higher grade. While the Attorney General conceded in oral argument that such an interpretation would render Chapter 70 nugatory and unconstitutional, it is certainly a debatable point and lends strength to the contention that the Act is unconstitutional on its face. As was said in Lane v. Wilson, supra [307 U.S. 268, 59 S.Ct. 876], "it hits onerous pro-

---

15. The Act also requires, on review of the Governor's decision, the preparation of a transcript of proceedings before the Governor as a condition precedent to a review by the state court. The costs of these transcripts could indeed be burdensome and the ability to supply same within 10 days may be impossible by reason of the right granted to all parents to intervene and the volume of testimony to be transcribed.

16. No provision is made for hearing the review by any party other than the Governor. § 2 provides for the appointment of agents by the Board for the purpose of holding hearings and making recommendations. But the Act apparently contemplates a personal hearing by the Governor.

cedural requirements which effectively handicap" the rights of those seeking the protection of the Fourteenth Amendment.

When the provisions of Chapter 68, approved contemporaneously with Chapter 70, are examined, it is manifest that the language of Chief Judge Parker in School Board of City of Charlottesville v. Allen, supra [240 F.2d 59], is appropriate wherein he said, *"Equity does not require the doing of a vain thing as a condition of relief"*. Under Chapter 68, if the Pupil Placement Board enrolls any Negro child in a school in which white children are already enrolled, or vice versa; or should the Governor, despite his emphatic statement that he will at no time permit "a little integration", act in a similar manner; or should any court enter any order directing the enrollment of a Negro child in any school in which white children are already enrolled or vice versa; it is provided that "such school is closed and is removed from the public school system". The school remains closed until the Governor, after an investigation, finds and issues an executive order stating "(1) The peace and tranquility of the community in which the school is located will not be disturbed by such school being reopened and operated, and (2) the assignment of pupils to such school could be accomplished without enforced or compulsory integration of the races therein contrary to the wishes of any child enrolled therein, or of his or her parent or parents, lawful guardian or other custodian" [17]. Not only is the particular school closed, but defendants concede that all schools of the *same class* within the particular political subdivision will also close by operation of law. For example, if one Negro child is admitted into an elementary school in the City of Norfolk wherein white children are already enrolled, then *all* elementary schools in the City of Norfolk are automatically closed. This is the "adequate

administrative remedy" which defendants will have this Court construe to be constitutional on its face.

Defendants urge that § 10 of Chapter 68 furnishes the loophole of protection as to constitutionality. It reads:

"Notwithstanding any other provision contained in this act, if after investigation the Governor concludes, or, at any time the school board or board of supervisors of the county or the council of the city in which the closed school is located, certifies to the Governor by resolution that in it or their opinion such school cannot be reopened, or reorganized and reopened, in conformity with provisions of this act, the Governor shall so proclaim, in which event the said school shall again become a part of the public school system of the political subdivision in which it is located, and such school, elementary or secondary, shall along with all other schools of its class in the political subdivision in which it is located thereby become subject to the applicable provisions of the laws of this State."

The so-called "adequate administrative remedy" inevitably leads to the closing of all public schools of the same class in the political subdivision affected. It is true that, subject to its ability to finance the same because of the cut-off provisions of Chapter 71 (the Appropriations Act), a political subdivision may, at its own option, then elect to operate this class of schools with both white and colored children in attendance, but even this provision does not answer Chapter 59 providing that no child shall be required to enroll in or attend any school wherein both white and colored children are enrolled. And defendants further contend that even if the political subdivision operated a certain class of schools under such conditions, the provisions of Chapter 70 re-

17. This provision of § 4 of Chapter 68 carries into effect the legislative act set forth in Chapter 59, approved September 29, 1956, which reads: "Notwithstanding any other provision of law, no child shall be required to enroll in or attend any school wherein both white and colored children are enrolled".

lating to the Pupil Placement Board would still be applicable [18].

There is nothing in Hood v. Board of Trustees, supra, and Carson v. Warlick, supra, to support the defendants' view that the recently enacted laws of Virginia are, by inference, constitutional on their face. The brief *per curiam* opinion in Hood does not discuss the constitutionality of the South Carolina statutes, and we are without the benefit of any historical background touching same. It is true that under § 21–2 of the Code of Laws of South Carolina this state has provided for the cut-off of public funds as to any school from which, and for any school to which, any pupil may transfer pursuant to, or in consequence of, *an order of any court,* for such time that the pupil shall attend a school other than the school to which he was assigned before the issuance of such court order. Neither the Circuit Court of Appeals in Hood, nor this Court in the present controversy, is presently faced with the constitutionality of the cut-off provisions as contained in either of the recently enacted South Carolina or Virginia laws. One striking distinction appears to exist on its face in considering the laws of these two states. South Carolina has only provided for the cut-off of funds *in the event of a court order* and has not decreed the actual closing of any school under any circumstances, whereas Virginia took the additional fatal step of providing for the automatic closing of all schools of the same class in the particular political subdivision as well as the cut-off of funds for such schools, *irrespective of whether any child was assigned to another school pursuant to an administrative remedy or court order.* In so doing, Virginia has exhausted the administrative remedy prior to the commencement thereof.

Other recent provisions of the Code of Laws of South Carolina, while not deemed pertinent for the discussion herein, are: § 21–46, § 21–103, § 21–247, § 21–247.1, § 21–247.2, § 21–247.3, § 21–247.4, § 21–247.5, § 21–247.6, § 21–247.7, § 21–230; and Act No. 712 of the General and Permanent Laws of South Carolina, 1956, approved March 16, 1956, 49 St. at Large, p. 1715. It is sufficient to state that, from a procedural standpoint, the administrative remedy afforded in South Carolina is far *less* complicated, less time-consuming and less expensive, than Virginia has seen fit to accord to its citizens.

In Carson v. Warlick, supra, the appellate court has held that the Pupil Placement Act of North Carolina is not unconstitutional on its face [19] North Carolina has not provided for either the automatic closing of any school or the cut-off of state or local funds. Obviously the remedies afforded by North Carolina do not lead to a complete "blind alley" such as Virginia has prescribed.

While there are other questions as to the constitutionality of other acts relating to school problems and enacted by the General Assembly of Virginia at its Extra Session 1956 this Court need only deal with Chapter 70, which must be read in light of the related acts, resolutions, and proclamations. It is the opinion of this Court that Chapter 70, as approved September 29, 1956, is unconstitutional on its face and must be disregarded for the further purposes of these cases. The United States Supreme Court has said in the second Brown case that good faith implementation of the governing constitutional principles is the proper test for courts to consider. Despite efforts to do so, this Court is unable to discern any evidence of "good faith" in

18. At the time of oral argument, one of counsel for defendants indicated to the contrary, but later all counsel for defendants stated that Chapter 70 would apply in any event.

19. All of the recent laws of North Carolina relating to the subject matter may be found in the General Statutes of North Carolina, § 115–176, § 115–177, § 115–178, § 115–179. It should be noted that that the Circuit Court of Appeals has not passed upon the constitutionality of certain acts passed at the 1956 Extra Session Laws of the General Assembly of North Carolina, including § 115–166 and the amendments to § 115–176, § 115–177 and § 115–178.

the provisions of Chapter 70 and several of the other legislative acts enacted at the 1956 Extra Session. The pattern is plain —the Legislature has adopted procedures to defeat the Brown decision. In doing so it is safe to say that Chapter 70 is invalid on its face.

■ Nothing herein contained should be construed as automatically granting to plaintiffs the right to enter schools of their choice. The words of District Judge Bryan in the Arlington school case, Thompson v. County School Board of Arlington County, 144 F.Supp. 239, quoted in the affirmance of his action by the Circuit Court of Appeals, are indeed appropriate. A local school board may as in years prior to the Brown decision, pass upon individual applications for school changes and, so long as discrimination solely by reason of race does not appear, there is no inherent right of any child to attend any particular school in which children of another race are in attendance. But as long as the school boards maintain an announced policy refusing to consider the applications separately and take no steps towards removing the requirement of segregation in the schools which the Supreme Court has held violative of the constitutional rights, there appears to be nothing any court may do other than to enjoin the violation of constitutional rights in the operation of schools by the authorities and, in the event of continued violation, proceed by way of contempt.

## The Necessity of a Three-Judge Court.

■ Little need be said as to the necessity of a three-judge court as provided by 28 U.S.C. § 2281. Despite the inclination of a District Judge to certify the need for same in matters of a sensitive nature such as these school segregation cases, it is clear that, under the pleadings in these cases, it would be improper to convene same. Plaintiffs do not seek an injunction against the enforcement of any state law. They merely request an injunction directed to defendants of any policy, practice, custom and usage of segregating students in the public schools. In Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336, a three-judge court held that no serious constitutional question, not theretofore decided by the Supreme Court of the United States, was presented. The complaint in Bush alleged that the Negro children had been denied admission to schools attended by white children, making reference to Louisiana Acts 555 and 556, LSA–R.S. 17:331 et seq., 17:81.1. The three-judge court was then dissolved and District Judge Wright, sitting as a single-judge court, proceeded to ascertain plaintiff's rights on an application for temporary injunction. The District Judge concluded that Louisiana Act 556 of 1954, an administrative remedy, was a part of a legislative plan for maintaining segregation in public schools and was, therefore, invalid on its face. With equal force the same principle is applicable in these cases now before the Court.

The history of the statute, 28 U.S.C. § 2281, reveals that only in cases involving the granting of an interlocutory injunction was a three-judge court required prior to 1948. During the latter year Congress added the proviso that a three-judge court is required where there is sought an interlocutory or permanent injunction restraining the enforcement, operation or execution of any state statute by restraining the action of any officer of such state in the enforcement or execution of the statute under attack.

The defenses raised on the motions to dismiss under the provisions of Chapter 70 are invoked for the purpose of defeating the jurisdiction of the Court. Similar defenses could be adopted in any routine case and, if a three-judge court be required, the District Judges would generally be sitting on a three-judge court. Such a practice would defeat the purpose of a three-judge court which has been designed for a specific class of cases, sharply defined, and which should not be lightly extended. Oklahoma Gas & Electric Co. v. Oklahoma Packing Co., 292 U.S. 386, 54 S.Ct. 732, 78 L.Ed. 1318; Phillips

v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800; Smith v. Wilson, 273 U.S. 388, 47 S.Ct. 385, 71 L.Ed. 699.

There is abundant authority to support the view that only a single-judge court is required to determine these motions to dismiss. To convene a three-judge court would be a futile act as it would be necessary to forthwith dissolve the same. The mere fact that the issues involve the delicate question of racial problems affords no reason for ordering a three-judge court. Bush v. Orleans Parish School Board, supra; Davis v. County School Board of Prince Edward County, D.C., 142 F.Supp. 616; Kelley v. Board of Education, D.C., 139 F.Supp. 578.

Order accordingly.