The SCHOOL BOARD OF THE CITY OF CHARLOTTESVILLE, VIRGINIA, and Fendall R. Ellis, Division Superintendent of Schools of the City of Charlottesville, Virginia, Appellants,

v.

Doris Marie ALLEN et al., Appellees.

COUNTY SCHOOL BOARD OF ARLINGTON COUNTY, VIRGINIA, and T. Edward Rutter, Division Superintendent of Schools, Arlington County, Virginia, Appellants,

v.

Clarissa S. THOMPSON et al., Appellees.

Nos. 7303, 7310.

United States Court of Appeals Fourth Circuit.

Argued Nov. 27, 1956.

Decided Dec. 31, 1956.

Writ of Certiorari Denied March 25, 1957.

See 77 S.Ct. 667.

John S. Battle, Charlottesville, Va. (John S. Battle, Jr., Charlottesville, Va., and Henry T. Wickham, Sp. Asst. to the Atty. Gen. of Virginia, on brief), for appellants in No. 7303.

Frank L. Ball, Arlington, Va. (James H. Simmonds, Arlington, Va.; and Henry T. Wickham, Sp. Asst. to the Atty. Gen. of Virginia, on brief), for appellants in No. 7310.

J. Lindsay Almond, Jr., Atty. Gen. of Virginia, for appellants in both cases.

Oliver W. Hill and Spottswood W. Robinson, III, Richmond, Va., for appellees in both cases (Martin A. Martin, Roland D. Ealey, Richmond, Va., and S. W. Tucker, Emporia, Va., on brief for appellees in No. 7303, and Edwin C. Brown, Alexandria, Va., on brief for appellees in No. 7310).

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

PARKER, Chief Judge.

These are appeals in actions instituted in behalf of Negro school children to enjoin School Boards and Division Superintendents of Schools from enforcing racial segregation. One action relates to the schools of the City of Charlottesville, Virginia, and the other to the schools of the County of Arlington in that state. Injunctions were granted in both cases and the school authorities have appealed, raising practically the same questions. The questions presented by the appeals are: (1) whether the actions should have been dismissed as suits against the state, (2) whether plaintiffs had failed to exhaust administrative remedies, and (3) whether there was abuse of discretion in entering the injunctive orders.

With respect to the Charlottesville case, it appeared on a hearing duly held that request had been made to the school authorities to take action toward abolishing the requirement of segregation in the schools and that no action had been taken. The District Judge in his opinion, after reciting the pertinent evidence, summarized his conclusions as follows:

"The prayer of the complaint is in substance that the defendants be enjoined from continuing to maintain segregated schools. The defendants have refused to agree to abandon the practice of segregation and have made it plain that they intend, if possible, to continue it. Under this state of facts the plaintiffs are undoubtedly entitled to maintain this action and to have the relief prayed for.

"It only remains to be determined as to the time when an injunction restraining defendants from maintaining segregated schools shall become effective. The original decision of the Supreme Court was over two

years ago. Its supplementary opinion directing that a prompt and reasonable start be made toward desegregation was handed down fourteen months ago. Defendants admit that they have taken no steps toward compliance with the ruling of the Supreme Court. They have not requested that the effective date of any action taken by this court be deferred to some future time or some future school year. They have not asked for any extension of time within which to embark on a program of desegregation. On the contrary the defense has been one of seeking to avoid any integration of the schools in either the near or distant future. They have given no evidence of any willingness to comply with the ruling of the Supreme Court at any time. In view of all these circumstances it is not seen where any good can be accomplished by deferring the effective date of the court's decree beyond the beginning of the school session opening this Autumn. Even though the time be limited it is not impossible that, at the school session opening in September of this year, a reasonable start be made toward complying with the decision of the Supreme Court."

The order, which by its terms was to become effective at the commencement of the school term beginning in September 1956, and which retained jurisdiction of the cause for such future action as might be necessary, restrained and enjoined the defendants:

"From any and all action that regulates or affects, on the basis of race or color, the admission, enrollment or education of the infant plaintiffs, or any other Negro child similarly situated, to and in any public school operated by the defendants."

The Arlington case was heard upon the pleadings and upon documentary evidence submitted to the court on a motion to dismiss. The judge found from the documentary evidence and from the statements of counsel in open court that there was no genuine issue as to any material fact in the case and that "on the admissions of record and the uncontrovertible allegations of the complaint, summary judgment should be granted the plaintiffs". With respect to exhaustion of administrative remedies he made the following finding:

"(d) That, as appeared from the said documentary evidence, the plaintiffs before instituting this suit had exhausted all administrative remedies then and now available to them, including the administrative steps set forth in Section 26–57 [22–57] Code of Virginia 1950, in that, they have since July 28, 1955, in effect maintained a continuing request upon the defendants, the County School Board and the Division Superintendent of Schools, for admission of Negro children to the public schools of Arlington County on a non-racial basis, and said request has been denied, or no action taken thereon, the equivalent of a denial thereof".

The decree, which was made effective with respect to elementary schools at the beginning of the second semester of the 1956–1957 session and with respect to high schools at the commencement of the 1957–1958 session, restrained and enjoined the defendants "from refusing on account of race or color to admit to, or enroll or educate in, any school under their operation, control, direction or supervision any child otherwise qualified for admission to, and enrollment and education in, such school."

The foregoing general language of the decree was limited by paragraph 4 thereof, which made clear that the court was not attempting to direct how the school board should handle the problem of assigning pupils but was merely forbidding unconstitutional discrimination on the ground of race or color. That paragraph is as follows:

"4. The foregoing injunction shall not be construed as nullifying

any State or local rules, now in force or hereafter promulgated, for the assignment of children to classes, courses of study, or schools, so long as such rules or assignments are not based upon race or color; nor, in the event of a complaint hereafter made by a child as to any such rule or assignment, shall said injunction be construed as relieving such child of the duty of first fully pursuing any administrative remedy now or hereafter provided by the defendants or by the Commonwealth of Virginia for the hearing and decision of such complaint, before applying to this court for a decision on whether any such rule or assignment violates said injunction."

In his memorandum filed at the time of the entry of the decree, the judge said:

"It must be remembered that the decisions of the Supreme Court of the United States in Brown v. Board of Education, 1954 and 1955, 347 U.S. 483 [74 S.Ct. 686, 98 L. Ed. 873] and 349 U.S. 294, [75 S. Ct. 753, 99 L.Ed. 1083] do not compel the mixing of the different races in the public schools. No general reshuffling of the pupils in any school system has been commanded. The order of the Court is simply that no child shall be denied admission to a school on the basis of race or color. Indeed, just so a child is not through any form of compulsion or pressure required to stay in a certain school, or denied transfer to another school, because of his race or color, the school heads may allow the pupil, whether white or Negro, to go to the same school as he would have attended in the absence of the ruling of the Supreme Court. Consequently, compliance with that ruling may well not necessitate such extensive changes in the school system as some anticipate."

■ We see nothing in these decrees of which the defendants can complain.

The decrees do not attempt to direct the school officials as to how they shall perform their duties or exercise the discretion vested in them by law, but simply forbid them to discriminate against the plaintiffs, or other Negro children similarly situated, on the ground of race or color, in violation of their rights under the Constitution of the United States as declared by the Supreme Court. A suit for such relief is not a suit against a state within the meaning of the 11th Amendment to the Constitution, but is a suit for the protection of individual rights under the Constitution by enjoining state officers and agencies from taking action beyond the scope of their legal powers. The difference between using the injunctive power of the court to direct the exercise of discretion by a state officer and using it to enjoin the violation by him of Constitutional rights under the authority of his office was pointed out nearly a half a century ago in Ex parte Young, 209 U.S. 123, 159–160, 28 S.Ct. 441, 453, 52 L.Ed. 714, where the court said:

"It is contended that the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer, to whose discretion is confided the use of the name of the state of Minnesota so far as litigation is concerned, and that when or how he shall use it is a matter resting in his discretion and cannot be controlled by any court.

"The answer to all this is the same as made in every case where an official claims to be acting under the authority of the state. The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect the state in its sovereign or governmental capacity. It is simply an illegal act

upon the part of a state official in attempting by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

See also Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L.Ed. 1440; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; State of Colorado v. Toll, 268 U.S. 228, 230, 45 S.Ct. 505, 69 L.Ed. 927; Ferris v. Wilbur, 4 Cir., 27 F.2d 262; Appalachian Electric Power Co. v. Smith, 4 Cir., 67 F.2d 451, 454.

 It is argued that the doctrine thus laid down must be confined to individuals and may not be applied to corporate agencies of the state such as school boards. We see no ground for such a distinction. If high officials of the state and of the federal government, [see Philadelphia Co. v. Stimson, supra] may be restrained and enjoined from unconstitutional action, we see no reason why a school board should be exempt from such suit merely because it has been given corporate powers. A state can act only through agents; and whether the agent be an individual officer or a corporate agency, it ceases to represent the state when it attempts to use state power in violation of the Constitution and may be enjoined from such unconstitutional action. While no such question was raised in the cases heard by the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the question was inherent in the record in those cases; and it is not reasonable to suppose that the Supreme Court would have directed injunctive relief against school boards acting as state agencies, if no such relief could be granted because of the provisions of the Eleventh Amendment to the Constitution.

There is nothing to the contrary in the decision of this court in O'Neill v. Early, 4 Cir., 208 F.2d 286, which was a suit against a state agency to establish a liability payable out of public funds controlled by the agency in its supervision of the state's educational system. We quoted from the decision of the Supreme Court, speaking through Mr. Justice Reed in Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 875, 88 L.Ed. 1121: "Efforts to force, through suits against officials, performance of promises by a state collide directly with the necessity that a sovereign must be free from judicial compulsion in the carrying out of its policies within the limits of the Constitution." This is, of course, a very different thing from enjoining a state officer or state agency from taking action violative of the Constitution.

 We think that the court was clearly right with respect to exhaustion of administrative remedies. The pupil placement law recently enacted by the General Assembly, Acts 1956, Ex.Sess., c. 70, had not become effective and, in so far as Section 22-57 of the Code of Virginia is concerned, that only provided for petition to a school board by joint action of five heads of families who felt themselves aggrieved by action of the board. If it could be held applicable to the plaintiffs here, its provisions were satisfied by the applications made to the boards without result in both cases here before us by counsel acting in behalf of plaintiffs. Defendants argue, in this connection, that plaintiffs have not shown themselves entitled to injunctive relief because they have not individually applied for admission to any particular school and been denied admission. The answer is that in view of the announced

policy of the respective school boards any such application to a school other than a segregated school maintained for Colored people would have been futile; and equity does not require the doing of a vain thing as a condition of relief. Reliance is placed upon our decision in Carson v. Warlick, 4 Cir., 238 F.2d 724. In that case, however, an adequate administrative remedy had been prescribed by statute, the plaintiffs there had failed to pursue the remedy as outlined in the decision of the Supreme Court of the State and there was nothing upon which a court could say that if they had followed such remedy their rights under the Constitution would have been denied them.

█ There is no basis for the contention that either of the judges below abused his discretion in granting the injunction. It had been two years since the first decision of the Supreme Court in Brown v. Board of Education and, despite repeated demands upon them, the boards of education had taken no steps towards removing the requirement of segregation in the schools which the Supreme Court had held violative of the constitutional rights of the plaintiffs. This was not "deliberate speed" in complying with the law as laid down by the Supreme Court but was clear manifestation of an attitude of intransigence, which justified the issuance of the injunctions to dispel the misapprehension of school authorities as to their obligations under the law and to bring about their prompt compliance with constitutional requirements as interpreted by the Supreme Court. Very much in point is the decision of the Court of Appeals of the Fifth Circuit in Jackson v. Rawdon, 5 Cir., 235 F.2d 93, 96, certiorari denied 77 S.Ct. 221, which reversed the action of a District Judge in refusing an injunction in a somewhat similar case. Speaking for the court in that case, Chief Judge Joseph C. Hutcheson said:

"We think it clear that, upon the plainest principles governing cases of this kind, the decision appealed from was wrong in refusing to declare the constitutional rights of plaintiffs to have the school board, acting promptly, and completely uninfluenced by private and public opinion as to the desirability of desegregation in the community, proceed with deliberate speed consistent with administration to abolish segregation in Mansfield's only high school and to put into effect desegregation there.

"Had the court made such a declaration and retained the cause for further orders necessary to implement it, deferment to a later time of action on the prayer for injunctive relief, if necessary, may well have been within his discretion. The issuance of such a declaration of rights with retention of the case would have given the court the means of effectually dispelling the misapprehension of the school authorities as to the nature of their new and profound obligations and compelling their prompt performance of them."

█ The decrees here are not harsh or unreasonable but merely require that the law be observed and discrimination on the ground of race be eliminated. The Arlington decree expressly states that local rules as to assignment to classes, so long as such rules are not based on race or color, are to be observed, and that administrative remedies for admission to schools must be exhausted before application is made to the court for relief on the ground that its injunction is being violated. While the Charlottesville decree does not contain this express provision, the provision is so eminently reasonable that we may safely assume that enforcement of that decree will not proceed upon different principles. As much was indicated by the Judge in his remarks denying the motion to dismiss.

Affirmed.