**Thomas Conrad GROVES, Joan Elaine Groves, Minors, by their parent, William Groves**

v.

**BOARD OF EDUCATION OF ST. MARY'S COUNTY, MARYLAND; G. Edward Thomas, President; May Russell, Vice-President; Mrs. Grace W. Knight; Robert E. Wigginton; Clarence Leo Young, all constituting the members of the Board of Education of St. Mary's County, Maryland, and Robbert A. King, Jr., Superintendent of Schools of St. Mary's County.**

Civ. No. 10485.

United States District Court
D. Maryland,
Civil Division.
Aug. 19, 1958.

Tucker R. Dearing and Juanita Jackson Mitchell, Baltimore, Md., and Jack Greenberg, New York City, for plaintiffs.

H. Vernon Eney, Robert R. Bair, and Venable, Baetjer & Howard, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

The principal purpose of this action is to secure the admission of Thomas Conrad Groves, a Negro, to the ninth grade at the Great Mills High School in St. Mary's County, Maryland, and of his sister, Joan Elaine Groves, to the eleventh grade at that school.

Following the decision of this court in Robinson v. Board of Education of St. Mary's County, July 9, 1956, 143 F.Supp. 481, the Board of Education, on July 31, 1956, accepted the recommendation of the Citizens' Advisory Committee and declared that integregation in the public schools of St. Mary's County would begin with the school year 1957–1958 on a voluntary basis in the elementary grades where administratively feasible. Nevertheless, in September, 1956, applications were filed with the Board seeking the admission of thirty-one Negro children to white public schools. After a number of conferences between the County Super-

intendent of Schools and the parents of some of the children, the Superintendent denied the applications. No appeals were taken from that action to the State Board of Education.

In May, 1957, instructions to parents seeking pupil transfers were distributed to all school principals and parents and were publicized through PTA meetings, the public press and the Lexington Park Radio station. Four Negro children requested transfer to elementary grades in white schools, and three Negro children, including the infant plaintiffs, requested transfer to high school grades. The Superintendent approved the requests for transfer to elementary grades, but denied the requests for transfer to high school grades, in accordance with the policy of the County Board. None of the four Negro children whose requests for transfer had been approved entered a white school; one moved out of the county; one request was withdrawn; the other two returned to the colored schools they had theretofore attended. The infant plaintiffs, through their father, appealed to the State Board of Education from the action of the County Superintendent denying their request. The appeals were not taken within the time fixed by statute. The State Board, however, granted a hearing, after which on February 26, 1958, it dismissed the appeals, but stated that if the appeals had been seasonably taken the Board would have dismissed them, because the Superintendent was acting in good faith pursuant to the integration policy promulgated by the County Board, and because "the question of whether the above-referred-to segregation policy of the County Board of Education of St. Mary's County contravenes the constitutional rights of the appellants in this case in denying their admission into the Great Mills High School is a question which is not within the scope of the powers of the State Board of Education to pass upon, or decide, for the reason that the same is a purely legal question to be decided through judicial proceedings." 3 Race Rel.L.Rep. 559. Thereafter, on April 11, 1958, this action was

filed on behalf of the infant plaintiffs and all other Negroes similarly situated.

On April 22, 1958, pursuant to a resolution of the County Board, the County Superintendent announced that for the school year 1958–1959 integration would be extended on a voluntary basis through grades seven, eight and nine. No plan has been announced or adopted for grades ten, eleven and twelve, but the Vice President of the Board testified that "their thinking" was that it "would probably follow next year", but that there are "too many factors to be considered to make a statement that such will be the case".

Since the hearing in this case on June 23, 1958, the Superintendent has notified plaintiffs that Thomas Conrad Groves will be admitted to the ninth grade at the Great Mills High School in September, 1958.

William Groves, the father of the infant plaintiffs, is a self-employed electrician, a citizen and taxpayer of St. Mary's County for seven years, who was educated in unsegregated schools in the North. He has been dissatisfied with the Jarboesville School, a consolidated (elementary, junior high and senior high) school for Negroes, to which his children would normally be assigned, not only because it is a segregated school, but also because he considered its physical facilities unsatisfactory and because it did not offer all of the courses which were offered at the Great Mills High School, to which his children would have been assigned if they had been white.[1] He was so dissatisfied that for a time he sent his daughter to school in New York. That proved unsatisfactory, and more recently he has been sending her to the Cardinal Gibbons High School, a parochial school in St. Mary's County, although that school is many miles from his home, and he must pay a small tuition fee. He desires his daughter to attend the Great Mills High School because he wishes her to have a desegregated education and to take certain courses[2] leading to a "Stenographic Major" Commercial diploma, which are offered there but which have not heretofore been offered at the Jarboesville School.

Like most Maryland counties, St. Mary's is engaged in a school building program to care for its rapidly expanding school population, and to provide more adequate buildings and facilities. So, at one time the white school in a particular section may have better facilities than the colored school, whereas the next year the facilities of the colored school may be better, and vice versa. Until 1955 all facilities at Jarboesville were inadequate, and to a considerable extent they have remained so. However, a new elementary school building has just been completed, and a large addition thereto, including science and commercial rooms, for use by elementary, junior and senior high grades, will be completed next year.

At Great Mills High School there are two commercial curricula, one leading to a Commercial diploma, General Business Major, the other leading to a Commercial diploma, Stenographic Major. The latter requires two years of shorthand, and is considered the better certificate. Heretofore Jarboesville has offered only the General Business Major curriculum but plans to offer the Stenographic Major curriculum this fall as well. The short-

---

1. Counsel, court and witnesses, including the Superintendent of Schools, used the word "course" from time to time in two different senses, noted by Webster, New Int'l Dict., 2d ed., as follows: "a. An entire series of studies having a unified purpose and usually leading to a degree or a diploma; as, a four-year *course;* a post-graduate *course.* b. In schools and colleges, a unit of instruction consisting of recitations, lectures, laboratory experiments, or the like, in a particular subject; also, the subject matter of such a unit of instruction." To avoid confusion, I will use the word "course" in the narrower sense to mean an individual unit, and will use the word "curriculum" to mean the entire series of "courses" leading, to a particular diploma.

2. Dictation and Transcription.

hand, typewriting and other required courses will be the same at both schools, but the elective courses which will be given at either school will depend upon the number of students who choose each of the various elective courses which will be offered. There are various student "interest clubs" at both schools, more at Great Mills. The commercial department in each school has valuable contacts with local business enterprises, Great Mills with those operated by whites, Jarboesville with those operated by Negroes.

It is clear that the commercial program at Jarboesville was not equal to the commercial program at Great Mills in the spring of 1957, when Joan Elaine Groves applied for transfer to Great Mills. It is impossible to determine at this time whether the new Stenographic curriculum which will be offered there this fall will be equal to the Stenographic curriculum at Great Mills.

It is doubtful whether any possible inequality in the programs may still be considered in such a case as this. See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U. S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083. The offering of certain courses or certain curricula in white schools which are not offered in any colored school in the county may be an element which should be considered by the court in weighing "these public and private considerations" referred to in the second Brown opinion. However, I do not base my decision of this case on any possible inequality between the programs at the two schools.

The Supreme Court has ruled that Negro children have a constitutional right to a desegregated education. The denial of that right to a child who applies for it can be justified only on equitable grounds similar to those listed in the second Brown opinion:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racial-

ly nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases." 349 U.S. at pages 300–301, 75 S.Ct. at page 756.

This court held in the Robinson case, 143 F.Supp. at page 492, that St. Mary's County had made a prompt and reasonable start toward compliance with the Supreme Court's ruling. The plan of desegregation which it has adopted appears to proceed with more than "deliberate" speed. But such a plan cannot be considered in the abstract, apart from the particular facts of each case. A delay which might be necessary to permit the solution of administrative problems created by the transfer of a considerable number of students is not justified in this case where only two Negro students are applying for admission to a white school, where one has been accepted into a grade which has already been desegregated, and it is hoped to desegregate the remaining grades next year.[3] The order of the State Board, read in connection with the opinion in the Robinson case, indicates that the State Board found no administrative problem justifying the denial of the applications filed on behalf of the two Groves children. The State Board evidently regarded the case as raising only a legal question of constitutional rights.

The second opinion of the Supreme Court in the Brown case, 349 U.S. at pages 300, 301, 75 S.Ct. at page 756, requires district courts to weigh the equities and to adjust and reconcile public and private needs. I do not question the good faith of the defendants in adopting the plan of desegregation nor their sincere belief that a further delay in the complete desegregation of the high schools is desirable. But constitutional rights are personal, and if Joan Elaine Groves does not receive a desegregated education at this time, she never will. Her rights and her needs cannot properly be postponed simply because the County Board and certain members of the community think it would be wiser to delay desegregation of the three highest grades. Without disapproving the overall plan, and without prejudice to defendants' right to offer the plan as a defense if additional applications are filed, I conclude that defendants have not shown any legally sufficient justification for denying to the infant plaintiff, Joan Elaine Groves, the constitutional right for which she has applied. Brown v. Board of Education, supra; Slade v. Board of Education of Harford County, 4 Cir., 252 F.2d 291, affirming Moore v. Board, D.C.D.Md., 152 F.Supp. 114, certiorari denied 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157, Allen v. County School Board of Prince Edward County, 4 Cir., 249 F.2d 462, 465; School Board of City of Charlottesville v. Allen, 4 Cir., 240 F.2d 59, certiorari denied 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664; Rippy v. Borders, 5 Cir., 250 F.2d 690; Aaron v. Cooper, 8 Cir., 243 F.2d 361.[4]

An appropriate decree will be entered.

3. The time has already expired within which application may properly be made under the regulations of the County Board by any student, white or Negro, for transfer from one public school to another for the year 1958–59.

4. In School Board of City of Charlottesville v. Allen, supra, Judge Parker quoted with approval the apt language of Judge Bryan: "It must be remembered that the decisions of the Supreme Court of the United States in Brown v. Board of Education, 1954 and 1955, 347 U.S. 483, [74 S.Ct. 686, 98 L.Ed. 873] and 349 U.S. 294, [75 S.Ct. 753, 99 L.Ed. 1083], do not compel the mixing of the different races in the public schools. No general reshuffling of the pupils in any school system has been commanded. The order of the Court is simply that no child shall be denied admission to a school on the basis of race or color. Indeed, just so a child is not through any form of compulsion or pressure required to stay in a certain school, or denied transfer to another school, because of his race or color, the school heads may allow the pupil, whether white or Negro, to go to the same school as he would have attended in the absence of the ruling of the Supreme Court. Consequently, compliance with that ruling may well not necessitate such extensive changes in the school system as some anticipate." 240 F.2d at page 62.