Earnestine DOVE, A Minor, Age 16, by her Father and Next Friend, William Dove, James Edwards Warfield, A Minor, Age 13, by his Father and Next Friend, New James Warfield, Corliss Smith, A Minor, Age 12, by her Mother and Next Friend (Mrs.) Sarah Smith, Plaintiffs,

v.

Lee PARHAM, President of Board of Directors, Dollarway School District Number 2, Jefferson County, Arkansas, Joe Pierce, Secretary, Board of Directors, Dollarway School District Number 2, Jefferson County, Arkansas, Robert Bryant, Member of Board of Directors, Dollarway School District Number 2, Jefferson County, Arkansas, Carl Purnell, Member of Board of Directors, Dollarway School District Number 2, Jefferson County, Arkansas, Orville Phillips, Member of Board of Directors, Dollarway School District Number 2, Jefferson County, Arkansas, Charles L. Fallis, Superintendent of Public Schools, Dollarway School District Number 2, Jefferson County, Arkansas, and the Dollarway School District Number 2, A Corporation, Defendants.

Civ. A. No. 3680.

United States District Court
E. D. Arkansas, W. D.
July 31, 1959.

Affirmed in Part and Reversed in Part
Oct. 8, 1959.

See 271 F.2d 132.

Robert L. Carter, New York City, and George Howard, Jr., Pine Bluff, Ark., for plaintiffs.

Mehaffy, Smith & Williams, Herschel H. Friday, Jr., and Robert V. Light, Little Rock, Ark., for defendants.

BECK, District Judge.

This is a class action [1], in equity, brought by school-age children of the Negro race and their parents and others similarly situated, as plaintiffs, against the members of the Board of Directors of the Dollarway School District No. 2, Jefferson County, Arkansas, and that district, a corporation, with jurisdiction invoked under 28 U.S.C.A. §§ 1331 as amended and 1343(3) and 42 U.S.C.A. §§ 1981–1983.

The controversy, in main, raises the question as to the merits of the plaintiffs' claims, that the acts and deeds of the defendants while acting or purporting to act pursuant to the laws of Arkansas, (1) in providing public schools for the plaintiffs and the class of persons they represent, on a segregated and separate basis because of race and color alone, and (2) assigning and compelling them to attend and denying them the right to enter, enroll, register and receive instructions in the schools open to all other children of school-age in that district, constitutes a denial of rights and privileges secured and guaranteed to them as citizens under the Constitution and laws of the United States. As remedies, they seek (1) injunctive relief against enforcement, execution or operation of the statutes, rules and regulations of which they complain and (2) a declaratory judgment answering the following questions:

"Whether the acts and deeds of defendants, or either of them, while acting or purporting to act pursuant to the laws of the State of Arkansas, or while acting under color of Arkansas laws, of providing public schools for plaintiffs on a separate and segregated basis because of the race and color of plaintiffs and assigning plaintiffs to separate and segregated public schools on the classification of race alone and of forcing and compelling plaintiffs to enroll in and attend such separate and segregated schools because of their race and color, deny to plaintiffs and the class of persons that they represent, their privileges and immunities as citizens of the United States, and the equal protection of the laws secured to them by the Fourteenth Amendment to the Constitution of the United States, or rights and privileges se-

---

1. Class action under Rule 23(a) (3), Fed.Rules Civ.Proc. 28 U.S.C.A.

cured to them by Sections 1981 or 1983, of Title 42, United States Code, and are, for those reasons, unconstitutional and void?

"Whether the acts and deeds of defendants, or either of them, while acting or purporting to act pursuant to the laws of the State of Arkansas, or while acting under color of Arkansas laws, of denying and refusing minor plaintiffs and the members of the class of persons that they represent, the right and privilege of registering, enrolling, entering, attending classes and receiving instruction in the public schools within the Dollarway School District Number 2 and under their supervision and control at the same time and under the same terms and conditions that all other minor residents of said district are permitted to register, enroll, enter, attend classes and receive instruction without any distinctions, restrictions, limitations or deprivations being made as to them because of, or on the basis of classification of, race or color, deny to minor plaintiffs and the members of the class of persons that they represent, privilege and immunities guaranteed to

them as citizens of the United States, or the equal protection of the laws secured to them by Sections 1981 and 1983, of Title 42, United States Code, and are, for those reasons, unconstitutional and void?" [2]

Other questions to be settled and determined are those which arise (1) on defendants' motion challenging the court's jurisdiction, (2) on another for summary judgment, (3) on one to reassign to a three-judge district court under 28 U.S.C.A. §§ 2281 and 2284, should constitutional questions of a substantial nature be raised, and (4) on one more to dismiss the plaintiffs' complaint on the ground that the plaintiffs prior to the time of the commencement of the suit failed to exhaust administrative remedies under the Arkansas Pupil Enrollment Act of 1956. [3]

■ As to (1) suffice it to say that the case clearly is within one or more of 28 U.S.C.A. § 1331 as amended and 42 U.S.C.A. § 1983 and that the motion, therefore, must be denied. Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.

■ The Arkansas Pupil Assignment Act of 1959 [4], which repeals the Arkansas

---

2. Plaintiffs' Complaint.

3. Arkansas Pupil Enrollment Act, Initiated Measure No. 2 (Ark.Stat. § 80-1519 et seq.) became effective December 6, 1956.

4. Pupil Assignment Act, Act 461 of the General Assembly of Arkansas (1959) became effective June 11, 1959 and is: "An Act to Control the Assignment and Placement of Pupils in the Public Schools; to Establish and Regulate the Procedure for Hearings by Local School Boards With Respect to the Operation of Public Schools; to Authorize the Attorney General to Render Advice and Assistance to Local School Boards; to Provide That School Boards Shall Exercise a Quasi Judicial Function With Respect to Hearings Upon the Assignment of Pupils; to Limit the Liability of School Boards, the Members Thereof, Officials and Employees in the Exercise of Their Official Duties as Herein Set Forth.

"Be It Enacted by the General Assembly of the State of Arkansas:

"Section 1. The legislature finds and declares that the rapidly increasing demands upon the public economy for the continuance of education as a public function and the efficient maintenance and public support of the public school system require, among other things, consideration of a more flexible and selective procedure for the establishment of units, facilities and curricula and as to the qualification and assignment of pupils.

"The legislature also recognizes the necessity for a procedure for the analysis of the qualifications, motivations, aptitudes and characteristics of the individual pupils for the purpose of placement, both as a function of efficiency in the educational process and to assure the maintenance of order and good will indispensable to the willingness of the citizens and taxpayers of the State of Arkansas to continue a public educational system as a necessary public function, and also

Pupil Enrollment Act of 1956, insofar as its provisions are in conflict therewith and which as to terms is in all material respects identical to the School Placement Law of Alabama, is *constitutional on its face,* since its provisions assure equal

a vital part of the sovereignty and police power of the State of Arkansas.

"Section 2. To the ends aforesaid, the State Board of Education shall make continuing studies as a basis for general reconsideration of the efficiency of the educational system in promoting the progress of pupils in accordance with their capacity and to adapt the curriculum to such capacity and otherwise conform the system of public education to social order and good will. Pending further studies and recommendations by the school authorities the legislature considers that any general or arbitrary reallocation of pupils heretofore entered in the public school system according to any rigid rule of proximity of residence or in accordance solely with request on behalf of the pupil would be disruptive to orderly administration, tend to invite or induce disorganization and impose an excessive burden on the available resources and teaching and administrative personnel of the schools.

"Section 3. Pending further studies and legislation to further effectuate the policy declared by this Act, the respective school districts and county Boards of Education, hereinafter referred to as 'local Boards of Education,' are not required to make any general reallocation of pupils already entered in the public school system and shall have no authority to make or administer any general or blanket order to take effect from any source whatever, or to give effect to any order which shall purport to or in effect require transfer or initial or subsequent placement of any individual or group in any unit or facility without a finding by the local Board that such transfer or placement is as to each individual pupil consistent with the test of the public and educational policy governing the admission and placement of pupils in the public school system prescribed by this Act.

"Section 4. Subject to appeal in the limited respect herein provided, each local Board of Education shall have full and final authority and responsibility for the assignment, transfer and continuance of all pupils among and within the public schools within its jurisdiction, and may prescribe rules and regulations pertaining to those functions. Subject to review by the local Board of Education as provided herein, the local Board of Education may exercise this responsibility directly or may delegate its authority to the Superintendent. In the assign-ment, transfer or continuance of pupils among and within the schools, or within the classroom and other facilities thereof, the following factors and the effect or results thereof shall be considered, with respect to the individual pupil, as well as other relevant matters: Available room and teaching capacity in the various schools; the availability of transportation facilities; the effect of the admission of new pupils upon established or proposed academic programs; the suitability of established curricula for particular pupils; the adequacy of the pupil's academic preparation for admission to a particular school and curriculum; the scholastic aptitude and relative intelligence or mental energy or ability of the pupil; the psychological qualification of the pupil for the type of teaching and associations involved; the effect of admission of the pupil upon the academic progress of other students in a particular school or facility thereof; the effect of admission upon prevailing academic standards at a particular school; the psychological effect upon the pupil of attendance at a particular school; the possibility of breaches of the peace or ill will or economic retaliation within the community; the home environment of the pupil; the maintenance or severance of established social and psychological relationships with other pupils and with teachers; the choice and interests of the pupil; the morals, conduct, health and personal standards of the pupil; the request or consent of parents or guardians and the reasons assigned therefor.

"Section 5. A local Board of Education may, by mutual agreement, provide for the admission to any school of pupils residing in adjoining districts whether in the same or different counties, and for transfer of school funds or other payments by one Board to another for or on account of such attendance.

"Section 6. Local Boards of Education shall have authority to assign and reassign or transfer all teachers in schools within their jurisdiction.

"Section 7. A parent or guardian of a pupil may file in writing with the local Board objections to the assignment of the pupil to a particular school, or may request by petition in writing assignment or transfer to a designated school or to another school to be designated by the Board. Unless a hearing is requested, the Board shall act upon the same within 30 days, stating its conclusion. If a

rights to all children in any Arkansas school district, as pupil assignments are made. Like conclusion as to *constitu-* *tionality on its face,* is also reached as to the Arkansas Pupil Enrollment Act of 1956, since its terms and provisions con-

hearing is requested the same shall be held beginning within 30 days from receipt by the Board of the objection or petition at a time and place within the school district designated by the Board.

"The Board may itself conduct such hearing or may designate not less than three of its members to conduct the same and may provide that the decision of the members designated or a majority thereof shall be final on behalf of the Board. The Board of Education is authorized to designate one or more of its members or one or more competent examiners to conduct any such hearings, and to take testimony, and to make a report of the hearings to the entire board for its determination. No final order shall be entered in such case until each member of the board of education has personally considered the entire records.

"In addition to hearing such evidence relevant to the individual pupil as may be presented on behalf of the petitioner, the Board shall be authorized to conduct investigations to any objection or request, including examination of the pupil or pupils involved, and may employ such agents and others, professional and otherwise, as it may deem necessary for the purpose of such investigations and examinations.

"For the purpose of conducting hearings or investigations hereunder, the local Board shall through its President, or Secretary, have the power to administer oaths and affirmations. It shall be the duty of each local Board to hear and consider all witnesses appearing before the said Board and having information pertinent and relative to the matter and to consider all relevant documentary evidence. Witnesses at such hearings conducted under this Act before a local Board, shall not be entitled to any witness fee.

"Section 8. Any other provisions of law notwithstanding, no child shall be compelled to attend any school in which the races are commingled with a written objection of the parent or guardian has been filed with the Board of Education. If in connection therewith a requested *assignment or transfer is refused* by the Board, the parent or guardian may notify the Board in writing that he is unwilling for the pupil to remain in the school to which assigned, and the assignment and further attendance of the pupil shall thereupon terminate; and such child shall be entitled to such aid for education as may be authorized by law.

"Section 9. The findings of fact and the action of the Board shall be final and such findings and action shall be made a part of the records of the local Board; however, if any pupil or the parent or guardian, if any, of any minor, or, if none, if the custodian of any such minor shall, as next friend, file an exception before such Board to the final action of the Board as constituting a denial of any right of such minor guaranteed under the Constitution of the United States or of any right under the Laws of Arkansas, and the Board shall not, within 15 days, reconsider its final action, an appeal may be taken from the final action of the local Board, on such ground alone, to the Circuit Court of the Judicial Circuit, and in which the school board is located, by filing with the Clerk of the Circuit Court within thirty (30) days from the date of the local Board's final decision a petition stating the facts relevant to such pupil as bearing on the alleged denial of his rights under the United States Constitution or the Constitution and/or laws of the State of Arkansas, accompanied by a surety bond approved by the said Clerk, conditioned to pay all costs of appeal if the same be not sustained. A copy of such petition and bond shall be filed with the President or the Secretary of the local Board from whose order, the petitioner is appealing. The filing of such petition of appeal shall not suspend or supercede an order of the local Board of Education; nor shall the Court have the power or jurisdiction to suspend or supercede the said order of the local Board issued under this Act before the entry, of the final decree in the proceedings, except that the Court may suspend such an order upon application by the petitioner made at the time of the filing of the petition for appeal, and after a preliminary hearing, and upon a prima facie *showing by the petitioner that the local* Board has acted unlawfully to the manifest detriment of the child who is the subject of the proceeding.

"On such appeal the Circuit Court will try the said cause de novo, but the determination made by the local Board shall remain in full force and effect until superceded by a lawful decree or order of the Circuit Court as set out herein. An appeal may be taken to the Supreme

form substantially to those in the Alabama and the other Arkansas Act. Shuttlesworth v. Birmingham Board of Education of Jefferson County, Alabama, D.C.1958, 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221.

Against that conclusion, the plaintiffs, mainly on the authority of Atkins v. School Board of City of Newport News, D.C.1957, 148 F.Supp. 430, affirmed 4 Cir., 1957, 246 F.2d 325, certiorari denied 1957, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed. 2d 63, contend that the Pupil Assignment Laws of Arkansas, even without its Acts 4 and 5—both having been declared unconstitutional and void on June 18, 1959 [5] —were a part of a plan and a scheme by the people of that state and its duly authorized representatives to maintain its traditional system of racial segregation in its public schools and to nullify the decisions in Brown v. Board of Education,

Court of Arkansas from the decisions of the Circuit Court in the same manner as appeals may be taken in other suits at law, either by the petitioner or by the local Board of Education.

"Section 10. The local Board before whom any objection or proceeding with respect to the placement of pupils is pending, may, upon authorization in writing of a majority of the elected members of the local Board, request the Attorney General of the State of Arkansas, to appear in such proceedings as amicus curiae to assist the local Board in the performance of its quasi judicial functions and to represent the public interest. Expenses of any reporters or any cost of such proceedings approved by the local Board, shall be the obligation of the district or county board involved and shall be paid from the public school funds of such district or county.

"Section 11. Since the determination of the matters required to be considered by the local Boards pursuant to the provisions of a quasi judicial nature the members of such local boards are clothed with the immunities of all other tribunals of a similar nature; the President and Secretary of each local board shall have the authority to administer oaths for the purpose of taking the testimony of witnesses appearing before the Board; such oath when administered, shall have the same effect as if administered by the foreman of a grand jury.

"Section 12. No Board of Education or any member thereof, nor any district or county employee or the superintendent thereof, or any teacher shall be answerable to any charge of libel, slander or other action, whether civil or criminal, by reason of any finding or statement contained in the written findings of fact or decisions or by reason of any written or oral statements made in the course of proceedings of deliberations provided for under this Act.

"Section 13. If any section, clause, sentence, paragraph, part or provision of this Act shall be found to be invalid or ineffective by any Court, it shall be conclusively presumed that this Act would have been passed by the General Assembly without such invalid section, clause, sentence, paragraph, part or provision and the Act as a whole shall not be declared invalid by reason of the fact that some part thereof may be found invalid by such Court.

"Section 14. All laws and parts of laws in conflict herewith are hereby repealed."

5. Arkansas Acts 4 and 5 of 1958 (2nd Ex.Sess.), as amended by Act 151, Ark. Acts of 1959.

A three-judge court in Aaron v. McKinley, D.C.E.D.Ark.1959, 173 F.Supp. 944, 950, held those Acts unconstitutional. The opinion, insofar as it relates to that point, states: "With all due respect to the considered views of those Justices of the Supreme Court of Arkansas who concluded that Act No. 4 represented a valid exercise of the police power of the State and therefore did not violate the Fourteenth Amendment to the Constitution of the United States, we are firmly of the opinion that Act No. 4 cannot be sustained upon that ground, and is clearly unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment, and conferred no authority upon the Governor to close the public high schools in Little Rock." And further they declared: "Since Act No. 5 is complementary to and dependent upon Act No. 4, and that Act is invalid, it follows that Act No. 5 is also invalid and completely ineffectual. We are satisfied that Act No. 5, as amended, cannot stand alone and did not, and does not, authorize the State Board of Education to deprive the Little Rock School District of State funds allocable to it for the maintenance of its schools on a constitutional basis, or to divert any part of those funds to other schools or other districts."

1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and in Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and that they for that reason were unconstitutional and void.

Such a contention is not supported by the Atkins v. School Board of City of Newport News case, supra. The Virginia Pupil Placement Laws were held unconstitutional and void under that decision, not because they were a part of a plan for maintaining of segregation and eventual nullifying of the Supreme Court directives against racial discrimination in public schools, but because that plan embraced an Act[6] in direct conflict with those directives, as it provided for the closing of all public schools, in any school district, and withdrawing of all public support therefrom if and when any racial integration in any school in such a district should take place or be permitted.

It is true that the court in that case regarded the various anti-racial integration acts in Virginia initiated and sponsored by its Governor, its General Assembly, other duly authorized legal representatives and its people, as a plan and a scheme to circumvent the decision in the Brown cases, yet, the court concluded that background as not fatal on the question of the constitutionality of the Virginia Pupil Placement Act, as it observed:

"* * * Virginia took the additional fatal step of providing for the automatic closing of all schools of the same class in the particular political subdivision as well as the cut-off of funds for such schools, *irrespective of whether any child was assigned to another school pursuant to an administrative remedy or court order.*" Atkins, supra, 148 F.Supp. at page 445.

and it gave emphasis to the point as it added:

"In Carson v. Warlick, supra [4 Cir., 238 F.2d 724], the appellate court has held that the Pupil Placement Act of North Carolina is not unconstitutional on its face. North Carolina has not provided for either the automatic closing of any schools or the cut-off of state or local funds. Obviously the remedies afforded by North Carolina do not lead to a complete 'blind alley' such as Virginia has prescribed." Atkins, supra, 148 F.Supp. at page 445.

In Shuttlesworth v. Birmingham Board of Education, supra, the court as it considered the constitutionality of the Alabama Pupil Assignment Law, had before it in the record a resistance plan to racial integration in the public schools of that state which included: (1) a report of the legislative interim committee, recommending an amendment to its state's constitution under which racial integration would be prohibited in the public schools; (2) enactment of a pupil placement law; (3) adoption of a Resolution of Interposition and Nullification[7],

6. Act Va.1956, Ex.Sess., c. 70 §§ 1 et seq., 2, 2a, 3(1–8), 4–11.

7. The Resolution of Interposition and Nullification was passed by the Special Session 1956 of the Alabama Legislature and became effective February 2, 1956, Act No. 42. It states: "'That until the issue between the State of Alabama and the General Government is decided by the submission to the states, pursuant to Article V of the Constitution, of a suitable constitutional amendment that would declare, in plain and unequivocal language, that the states do surrender their power to maintain public schools and other public facilities on a basis of separation as to race, the Legislature of Alabama declares the decisions and or- ders of the Supreme Court of the United States relating to separation of races in the public schools are, as a matter of right, null, void, and of no effect; and the Legislature of Alabama declares to all men as a matter of right, this State is not bound to abide thereby; we declare, further, our firm intention to take all appropriate measures honorably and constitutionally available to us, to avoid this illegal encroachment upon our rights, and to urge upon our sister states their prompt and deliberate efforts to check further encroachment by the General Government, through judicial legislation, upon the reserved powers of all states.'" Shuttlesworth, supra, 162 F. Supp. at page 380.

and (4) under the theory of judicial notice, all other acts and resolutions of the state legislature and other acts by duly authorized representatives of the state evincing hostility to the integration edicts. But the court, even as it referred to that plan, of which the Pupil Placement Law was a part, as one tending to show a strong and definite plan or scheme to circumvent the rule in the segregation cases, held that plan as one not having bearing on the constitutionality of that law as it concluded:

"All that has been said in this present opinion must be limited to the constitutionality of the law *upon its face*. The School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the state." Shuttlesworth, supra, 162 F.Supp. at page 384.

■ Implicit, in the rules applied in those cases and controlling on the Arkansas Pupil Assignment Laws being within constitutional boundaries is the principle, that a state plan for resistance to racial integration in its public schools, is without significance as to the constitutionality of such laws if legitimate and constitutional means are used in the operation of the plan and the attainment of its objectives.[8] Shuttlesworth v. Birmingham Board of Education, supra, and Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724. It is otherwise, however, if in the process of such resistance a state resorts to enactment of an act which nullifies the integration doctrine. Atkins v. The School Board of City of Newport News, supra. See also Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156.

■ The defendants have moved to dismiss the complaint on the ground that the plaintiffs, prior to the commencing of their suit, failed to avail themselves of all of the administrative remedies provided for by the Arkansas Pupil Enrollment Act of 1956.

It is true that they didn't. The "exhaustion of administrative remedies rule," which defendants invoke, nevertheless does not apply.

Under this record it is conclusively established, that the superintendents and the officers of the defendant school district and its Board of Directors, throughout the three school years when the plaintiffs, Earnestine Dove, James Edwards Warfield and Corliss Smith, sought admission to the white schools in the district, before that time and since, have had and continue to have and through its superintendents and other managing personnel, have carried into effect, enforced and maintained, a rigid, racial segregation policy in all of its schools, which, without exception, permitted no entry of any colored child into its white schools. It is established, too, that the Board intends a continuation of that policy, without any change or modifications and that its professing of the Pupil Enrollment Act of 1956 having been applied and in

---

The Arkansas Resolution of Interposition states in part: "Therefore, The People of Arkansas, by Popular Vote: * * 2. Pledge our firm intention to take all appropriate measures, honorably and legally available to us, to resist any and all illegal encroachments upon the powers reserved to the State of Arkansas to order and control its own domestic institutions according to its own exclusive judgement."

8. Cooper v. Aaron, 358 U.S. 1, at page 24, 78 S.Ct. 1401, at page 1413, 3 L.Ed. 2d 5: "The duty to abstain from resistance to 'the supreme Law of the Land,' U.S.Const., Art. VI. § 2, as declared by the organ of our Government for ascertaining it, does not require immediate approval of it nor does it deny the right of dissent. Criticism need not be stilled. Active obstruction or defiance is barred."

operation during the years 1957, 1958 and 1959, is but a cover-up to conceal its anti-racial and pro-racial segregation attitude.

These are the facts. The record permits no other conclusion. Dove, Warfield and Smith exhausted their administrative remedies, actually, under the Act, as they applied for admission the first time and were denied. They got the same results as they made their second and third attempt. Another one, on a petition for hearing before the Board, would indeed have been futile and therefore not required as a requisite to the commencement of this suit.

A factual situation, substantially like this one, was before the court in the case of Bush v. Orleans Parish School Board, D.C.E.D.La.1956, 138 F.Supp. 337, 341, where it was said:

"As a practical matter, plaintiffs here have exhausted their administrative remedies. They have petitioned the Board on three separate occasions asking that their children be assigned to non-segregated schools. The Board not only has refused to desegregate the schools, but has passed a resolution noting the existence of the present suit and stating, 'It is not only to the manifest interest of this Board and in accord with its expressed policy, but also in furtherance of the public welfare of this community that this suit and any others that might be instituted with the same objective be vigorously, aggressively, and capably defended.' To remit each of these minor children and the thousands of others similarly situated to thousands of administrative hearings before this Board, to seek the relief to which the Supreme Court of the United States has said they are entitled, would be a vain and useless gesture, unworthy of a court of equity. It would be a travesty in which this court will not participate."

That case was affirmed in the case of Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156.

Again in the case of School Board of City of Charlottesville v. Allen, 4 Cir., 1956, 240 F.2d 59, 60, we have the following comment by Chief Judge Parker:

"Equity does not require the doing of a vain thing as a condition of relief."

See also Bruce v. Stilwell, 5 Cir., 1953, 206 F.2d 554, and Parker v. Lester, D.C. N.D.Cal., S.D.1953, 112 F.Supp. 433.

A reminder as to the duties of a school board intrusted with the implementation of the integration doctrine and administration of a pupil assignment law, clearly, at this point is in order.

The area in which school boards in the course of their administration of their school district may operate, be it within or without pupil assignment laws, are referred to in the case of Briggs v. Elliott, D.C.E.D.S.C.1955, 132 F.Supp. 776, at page 777:

"Having said this, it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches.

Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals.",

quoted with approval in Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, and in School Board of City of Charlottesville v. Allen, supra.

Again in Thompson v. County School Board of Arlington County, D.C.E.D.Va. 1956, 144 F.Supp. 239, there are other indications as to the extensiveness of a board's powers:

"It must be remembered that the decisions of the Supreme Court of United States in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 and 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, do not compel the mixing of the different races in the public schools. No general reshuffling of the pupils in any school system has been commanded. The order of that Court is simply that no child shall be denied admission to a school on the basis of race or color. Indeed, just so a child is not through any form of compulsion or pressure required to stay in a certain school, or denied transfer to another school, because of his race or color, the school heads, may allow the pupil, whether white or Negro, to go to the same school as he would have attended in the absence of the ruling of the Supreme Court. Consequently, compliance with that ruling may well not necessitate such extensive changes in the school system as some anticipate.",

which language is quoted with approval in the per curiam opinion of the Court of Appeals for the Fourth Circuit in School Board of City of Newport News, Virginia v. Atkins, 1957, 246 F.2d 325.

There are restrictions, however, on such powers. Those are referred to in Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083, where it is said:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; *courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.*" (Emphasis supplied.)

The court in that case continued:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies [9] and by a facility for adjusting and reconciling public and private needs.[10] These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision.

9. See Alexander v. Hillman, 296 U.S. 222, 239, 56 S.Ct. 204, 80 L.Ed. 192.

10. See Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754.

Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. *But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.*

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases." (Emphasis supplied.)

Again in the case of Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 1409, 3 L.Ed. 2d 5:

"In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, *nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.'* (Last emphasis supplied.) Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84."

The defendants by answer admit: (1) "that plaintiffs are citizens of the United States, the state of Arkansas, and are domiciled in Jefferson County"; (2) "that the minor plaintiffs heretofore have attended the public schools of the defendant district", and (3) "that the defendants have not heretofore had, nor do they now have, any knowledge of any disqualification of any of the minor plaintiffs from attending the said schools."

The proof, as heretofore found and declared shows the plaintiffs, Dove, Warfield and Smith, to have been denied admission to the white schools, only because of race and the Board's anti-integration policy and none to prove that they did not have the same qualifications as the white children who were admitted.

That record constituted prima facie proof of the qualifications of Dove, Warfield and Smith for admission to the white schools where they applied. It was then for the defendants, under the affirmative defenses in their answer, to counter with proof that the Pupil Enrollment Act in good faith had been and was being applied and that those plaintiffs pursuant to the terms of that Act had been properly classified and assigned. They failed in this respect as heretofore shown and determined. Plaintiffs' prima facie case, on this point, remains undisturbed. And the presumptions of qualification for admission to any public school in the defendant district, which necessarily arises out of American citizenship, school age status and residence in the district hasn't been overcome. 44 Iowa L.Rev. 147 (1958).

The Court for these reasons and others discussed, finds that the plaintiffs, Dove, Warfield and Smith, had the necessary admission qualifications; that their applications were illegally denied and that they must be admitted to the white schools in the defendant district as the 1959–1960 school year is commenced.

For the reasons assigned in the discussion of the question before the court under this record and the rules referred to in the authorities, it is held that there is no basis for a reassignment of the case to a three-judge court under 28 U.S.C.A. §§ 2281 and 2284.

It is the judgment and declaration of this court: (1) that the Arkansas Pupil Enrollment Act of 1956 was constitutional on its face; (2) that the Arkansas Pupil Assignment Act of 1959 is constitutional on its face; (3) that the Board of Directors of the Dollarway School District No. 2 of Jefferson County, Arkansas, its individual members, the defendant School District itself, its Superintendent and Officers, and their successors in office, be, and they are hereby directed to admit the plaintiffs, Earnestine Dove, James Edwards Warfield and Corliss Smith, or either of them, as pupils, to the white schools in the district, at the beginning of the 1959–1960 school year and that they, the said defendants and each of them, and their successors in office, be, and they are hereby permanently enjoined from engaging in any act or acts, which within the doctrine of Brown v. Board of Education (1954 and 1955) cases, supra, will directly or indirectly impede, thwart, delay or frustrate, the progress of said plaintiff children as they attend such schools; (4) that the defendants and each of them and their successors in office, forthwith, but not later than the beginning of the 1959–60 school year in the defendant district, in good faith and within the doctrine enunciated in the aforementioned Brown v. Board of Education cases, proceed with and apply the rules and regulations prescribed by the Arkansas Pupil Assignment Act of 1959, and (5) that the court will retain its jurisdiction of the case.